UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 20-62643-CIV-SINGHAL

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NO.
B0901LH1620115000,

    Plaintiff,

v.

EMPRESS MARINE VENTURES, LTD.,

    Defendant.
_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court on competing motions for summary judgment. Plaintiff filed its Amended Motion for Summary Judgment and Memorandum of Law in Support of Summary Judgment (DE [75]) and Statement of Undisputed Material Facts in Support Motion for Summary Judgment (DE [74]). Defendant filed its opposition (DE [104]) and statement in opposition (DE [105]). Plaintiff responded to Defendant's statement in its Reply to Empress Marine's Statement of Material Facts (DE [116]) and a subsequent reply (DE [115]). Defendant filed its Motion for Summary Judgment (DE [76]) and Statement of Material Facts in Support of Fed. R. Civ. P. 46 Motion for Summary Judgment (DE [77]). Plaintiff filed its opposition (DE [101]) and statement in opposition (DE [102]). Defendant filed a subsequent reply (DE [117]). Accordingly, the matters are fully briefed and ripe for review.

**I.      PROCEDURAL HISTORY**

Plaintiff Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0901LH1620115000 ("Plaintiff") commenced this action as an admiralty and maritime cause within the meaning of Federal Rules of Civil Procedure 9(h), 38(e), and 82.  On December 22, 2020, Plaintiff filed a Complaint for Declaratory Relief ("Complaint") (DE [1]) against Defendant Empress Marine Ventures, Ltd. ("Empress Marine") seeking a determination that an express warranty of the Policy was violated due to Captain Sackmann's failure to observe laws and regulations related to navigation within a marked channel, and as to Underwriters' determination that the reasonable cost of repairs to the Vessel did not exceed $4.15 million.  On March 12, 2021, in response to the Complaint (DE [1]), Empress Marine filed its Motion to Dismiss & Counterclaim (DE [9]).

On March 19, 2021, Plaintiff filed its Amended Complaint for Declaratory Relief ("Amended Complaint") (DE [10]) pursuant to 28 U.S.C. § 2201, in connection with a dispute over insurance coverage related to repairs to the M/Y "Never Say Never" (the "Vessel"), a 2011 130' Sunseeker Predator motor yacht, hull identification no. GB-XSK05273E111, registered in the Cayman Islands under official no. 743599 and owned by Empress Marine.  (Am. Compl. (DE [10]) ¶ 11).  Plaintiff asserts a claim for Breach of Express Warranty (Count I) and Declaratory Judgment (Count II).  On April 2, 2021, Empress Marine filed its Answer & Counterclaim (DE [14]).  Empress Marine asserts a claim for Breach of Covenant of Good Faith and Fair Dealing (Count I) and Declaratory Judgment pursuant to 28 U.S.C. § 2201 (Count II) against Plaintiff (the "Counterclaim").

On February 28, 2023, this Court granted in part and denied in part Plaintiff's Motion to Dismiss Counterclaim of Empress Marine Ventures Ltd. and Motion to Strike

Jury Trial Demand (DE [15]).  *See* (Order (DE [46]) entered Feb. 28, 2022).  The remaining claims before this Court are Plaintiff's Count I for breach of express warranty, Count II for declaratory judgment and Empress Marine's counterclaim for breach of covenant of good faith and fair dealing.  Plaintiff raises the affirmative defense of waiver and estoppel, while Empress Marine asserts waiver, estoppel, failure to state a claim, and lack of causation as affirmative defenses.

## II.     **BACKGROUND FACTS**

Empress Marine purchased the Vessel in the summer of 2015 or 2016 for 8 million euros in France.  (Def. Resp. (DE [66]) ¶ 1) ("Disputed."); *see* (Pl. Stat. (DE [74]) ¶ 1) (claiming, without support, that the Vessel was purchased in 2015 for $8 million U.S. dollars).  Plaintiff issued a Hull and Machinery Policy to Empress Marine, policy no. B0901LH1620115000 (the "Policy"), with effective dates of July 31, 2016 to July 31, 2017 to insure the Vessel.  *See* (Pl. Stat. (DE [74]) ¶ 1); *see also* (Def. Stat. (DE [77]) ¶¶ 1–3).

In December 2016, the Vessel was in transit from Fort Lauderdale, Florida to Casa de Campo in the Dominican Republic, under the temporary command of relief captain, Dusty Sackmann ("Captain Sackmann"), with the Vessel's Chief Engineer, Russell Masterman, also on board.  *See* (Pl. Stat. (DE [74]) ¶ 11); *see also* (Def. Stat. (DE [77]) ¶ 8). On December 28, 2016, while entering the channel to Puerto Plata on the northern coast of the Dominican Republic, the Vessel grounded after Captain Sackmann, was unable to discern a partially submerged channel marker and was operating the Vessel outside of a marked channel (the "Incident").  *See* (Pl. Stat. (DE [74]) ¶ 12); *see also* (Def. Stat. (DE [77]) ¶ 8).  The Vessel sustained some damage to her structure, hull, fuel and water tanks, starboard stabilizer and propulsive stern gear as a result of the Incident and

was moved by Captain Sackmann to Ocean World Marina in Puerto Plata, Dominican Republic. *Id.* ¶ 20–22. The Vessel's permanent captain, Robin Todd ("Captain Todd"), rejoined the Vessel shortly after the Incident, where the Vessel was docked at Ocean World Marina. *See* (Pl. Stat. (DE [74]) ¶ 13). During the approximate four weeks that the Vessel was docked at Ocean World Marina, it sustained additional damage due to heavy weather (the "Marina Incident"). *Id.*

On January 23, 2017, Plaintiff instructed a surveyor to survey the Vessel to ascertain the extent of the damage and on January 24, 2017, the Vessel was towed back to Fort Lauderdale, Florida, for additional inspection and assessment of repairs needed. *See* (Def. Stat. (DE [77]) ¶ 14). During the Vessel's towage, the Vessel encountered heavy pitching waves and sustained some additional damage (the "Towage Incident"). (Am Compl. (DE [10]) ¶¶ 23–24); *see also* (Def. Stat. (DE [77]) ¶ 16); (Pl. Resp. (DE [102]) ¶ 16) ("Undisputed."). On January 28, 2017, the Vessel arrived in Fort Lauderdale, Florida and was taken in tow up the New River towards Lauderdale Marine Center. *See* (Am Compl. (DE [10]) ¶ 24); *see also* (Def. Stat. (DE [77]) ¶ 15); *but see* (Pl. Resp. (DE [102]) ¶ 15) ("Disputed. The record cite provided by Defendant does not support this purported or alleged "fact" and Defendant has not produced information sufficient to substantiate this purported or alleged "fact.").[1] Empress Marine subsequently made three insurance claims relating to the Incident, the Marina Incident, and the Towage Incident. *See* (Am Compl. (DE [10]) ¶ 25); *see also* (Def. Stat. (DE [77]) ¶ 17); (Pl. Resp. (DE [102]) ¶ 17) ("Undisputed.").

---

[1] The Court will not expend valuable judicial resources searching for resolution of such purported factual disputes. *See* S.D. Fla. L.R. 56.1(a)(2) ("An opponent's Statement of Material Facts shall clearly challenge any purportedly material fact asserted by the movant that the opponent contends is **genuinely in dispute**.") (emphasis added).

4

Plaintiff caused a full investigation to be conducted related to the three incidents to determine the extent of coverage and the reasonable cost of repairs to the Vessel. (Am. Compl. (DE [10]) ¶ 26). The Vessel was hauled out on February 3, 2017, and blocked off for inspection by Empress Marine's surveyors, Roy Shorter and Alan Doman of A1 Surveyors (collectively "A1 Surveyors"). *Id.* ¶ 27–28. Plaintiff claims it requested a repair protocol, estimates for repair and a survey report following the inspection of A1 Surveyors to try to adjust the loss but it did not receive a survey report from the initial survey and the work was not sent out for bid to multiple shipyards. *Id.* ¶ 29–30. Instead, Empress Marine retained Sunseeker Yacht Services in Fort Lauderdale, Florida to commence repairs to the Vessel. (Am. Compl. (DE [10]) ¶ 31); *see also* (Def. Stat. (DE [77]) ¶ 21); *but see* (Pl. Resp. (DE [102]) ¶ 21) ("Disputed. The record cite provided by Defendant does not support this purported or alleged "fact" and Defendant has not produced information sufficient to substantiate this purported or alleged "fact.").

On June 16, 2017, the Vessel was hauled out again for under cover repairs at the Lauderdale Marine Center "East Yard" coordinated by Captain Todd, A1 Surveyors, and Peter Gimpel, a Naval Architect with Winchester Design Group, Inc. (Am. Compl. (DE [10]) ¶ 33). On May 13, 2019, Captain Todd's employment contract with Empress Marine was terminated, and the Vessel's chief engineer, Russel Masterman, coordinated the repairs from that point until his departure from the Vessel, at which time, repairs were coordinated by Captain James Farnborough. *Id.* ¶ 34. Plaintiff claims it was willing to cooperate and resolve the claims, but Empress Marine caused the Vessel to undergo repairs over the next nearly four and a half years, without proper management and coordination of repairs or supervision of contractors, causing the repair costs to exceed

8.2 million dollars. Due to the prolonged nature of repairs to the Vessel and the repeated, substantial increases in costs of repair, Plaintiff retained the services of Peter Stembridge, the Managing Director of Seawing Europe, to assist in continuing to investigate and handle the claims. *Id.* ¶ 35. Plaintiff, in conjunction with their expert, Peter Stembridge, determined that the reasonable cost to repair the Vessel was half that amount. *Id.* ¶¶ 36–51; *see also* (Am. Compl. (DE [10-2]) Ex. B). Peter Stembridge's written report, dated September 9, 2019, concluded the Vessel should have been repaired for $3,459,634.00. *See* (Def. Stat. (DE [77]) ¶ 48); *but see* (Pl. Resp. (DE [102]) ¶ 48) ("Disputed. The record cite provided by Defendant does not support this purported or alleged "fact" and Defendant has not produced information sufficient to substantiate this purported or alleged "fact.""). This opinion, however, is directly contradicted by Neil Maclaren in May 2019, where he indicates about $4 million had already been reasonably expended in repairs. *See* (Def. Stat. (DE [77]) ¶ 49); *but see* (Pl. Resp. (DE [102]) ¶ 48) ("Disputed. The record cite provided by Defendant does not support this purported or alleged "fact" and Defendant has not produced information sufficient to substantiate this purported or alleged "fact.""); *see also* (Ex. 42 (DE [79-15] at 1).

In its Counterclaim (DE [14]), Empress Marine asserts the marine surveyors began examining the Vessel to ascertain the scope and extent of damages inflicted on the Vessel in February 2017 and concluded that "removing interior hull and machinery is necessary in order to properly assess the scope and extent of damages suffered by the Vessel." (Ans. (DE [14]) ¶ 20–21 (p. 11 of 16)). They estimated the repairs would take well over a year and were completed in November 2020. *Id.* ¶ 22–24. Empress Marine claims these delays were caused by Plaintiff and Plaintiff's specific acts of omission

including not declaring the Vessel a total loss at the outset and not properly investigating the claims. *Id.* ¶ 26. Empress Marine alleges Plaintiff's insurance adjuster, Neil McLaren, initially claimed the Vessel could be repaired for approximately $700,000.00 but failed to properly document or justify the initial estimate for the cost of repairs and then withdrew from the assignment. *Id.*; *see also id.* ¶ 31. Empress Marine claims Plaintiff delayed in assigning a new insurance adjuster to the assignment which further delayed financing for repairs. *Id.* ¶ 26.

Plaintiff and Empress Marine entered into a series of partial settlement agreements totaling millions of dollars, which served as advances while the ultimate cost of repair was evaluated. *See* (Partial Release Forms (DE [74-7]) Ex. 7); *see also* (Pl. Stat. (DE [74]) ¶ 14); (Def. Resp. (DE [105]) ¶ 14) ("Undisputed."). Each Partial Release Form (DE [74-7]) describes the payment as "advance payment for a portion of the cost to repair the Vessel . . . ." *See* (Partial Release Forms (DE [74-7]) Ex. 7); *see also* (Pl. Stat. (DE [74]) ¶ 15); (Def. Resp. (DE [105]) ¶ 15) ("Undisputed. But the language of the partial releases speaks for itself.").

### III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a));[2] *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

---

[2] The 2010 Amendment to Rule 56(a) substituted the phrase "genuine dispute" for the former "'genuine issue' of any material fact."

7

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). "[T]his, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

## IV.  POLICY LANGUAGE[3]

The issue the parties have asked the Court to resolve is the amount of money owed to Defendant under the Policy. Under SECTION "A" - HULL INSURANCE, the

---

[3] *See* (Pl. Stat. DE [30-1]) Ex. 1); (Pl. Stat. (DE [74-1]) Ex. 1).

8

policy provides:

> **NEW FOR OLD**
> In the event of loss or damage, cost of repairs to be paid without deduction, new for old, except with respect to sails and covers of canvas or other like materials, the Assurers shall be liable for no more than **the cost of repair or a reasonable value**.

(Ex. 1 (DE [30-1]) at 26); (Ex. 1 (DE [74-1]) at 27) (emphasis added).

The Policy further provides:

> **Navigating**: Inland and coastal waters of the east and Gulf coast U.S.A. between Eastport, Maine and Brownsville, Texas, including the Bahamas and the Turks and Caicos Islands. Plus waters of the Mediterranean Sea, including adjacent seas, excluding Israel, Lebanon, Libya and Syria.

(Ex. 1 (DE [30-1]) at 2); (Ex. 1 (DE [74-1]) at 3) (emphasis added).  Plaintiff, however, expressly expanded the coverage to include the Caribbean.  *See* (Ex. 2 (DE [106-2]) at 1) ("We will now need to endorse the policy to include Caribbean navigating as this is not currently included within the policy.  An endorsement to this effect will follow tomorrow.").

"[U]nder Florida law, courts will enforce 'choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.'" *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (quoting *Mazzoni Farms v. E. I. Dupont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000)).  The parties do not dispute that New York law is controlling under the Policy.  *See* (Am. Compl. (DE [10-1], p. 7) (Plaintiff's Exhibit A, the insurance policy at issue in this litigation stating "Choice of law & Jurisdiction: New York").  The Partial Release Forms (DE [74-7]), however, are "governed in accordance with the laws of the State of Florida without regard to that State's conflict of law rules."  (Ex. 7 (DE [74-7]) at 4–14).  The parties do not dispute that Florida law is controlling under the Partial Release Forms.  *See id.*

**V.     DISCUSSION**

Plaintiff moves for summary judgment on all claims pending in this case.  First, Plaintiff argues Empress Marine breached the Policy's express warranties thereby forfeiting coverage as a matter of law.  Second, Plaintiff claims Empress Marine's unclean hands bars recovery of insurance benefits under the Policy as a matter of law.  Third, Plaintiff insists even if Empress Marine did not forfeit coverage entirely, the Policy unambiguously requires Underwriters to only pay for repairs that are fair, reasonable, and related to the underlying claim.  Lastly, Plaintiff argues the actual amount paid by Empress Marine, payments received by Empress Marine from Plaintiff, and Empress Marine's sale of the subject Vessel for $5.7 million mandate an analysis of the alleged damages claimed in this case concluding that Empress Marine is not allowed a recovery, if any, of an amount greater than the insured value of the Vessel.

Empress Marine argues undisputed facts show Plaintiff waived any right it may have had to deny coverage and is estopped from denying coverage as a matter of law. In addition, Plaintiff waived any right to claim it is liable only for the "reasonable value" of the repairs rather than the "cost of repair" because it was aware of the cost of repairs and failed to object to these mounting costs while the repairs were underway.

"Summary judgment may be granted only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hastings Dev., LLC v. Evanston Ins. Co.*, 701 Fed. Appx. 40, 42 (2d Cir. 2017) (citation omitted). "Whether an insurance policy is ambiguous as a matter of law is to be determined by the court."  *Id.* (quoting *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616–17 (2d Cir. 2001)).  "Where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered."  *Hastings*, 701 Fed. Appx. at 42 (quoting *JA*

10

*Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  "Under New York law, contractual interpretation on a summary judgment motion takes place in two stages.  First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous."  *Great Minds v. John Wiley & Sons, Inc.*, 204 F. Supp. 3d 507, 511 (S.D.N.Y. 2016).  If the Court determines that the contractual language is ambiguous, then it should generally deny summary judgment.  *See id.*  If the Court concludes that the contractual terms are "complete, clear, and unambiguous," it must interpret those terms according to their plain meaning.  *Id.* at 512.

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  "The language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  *Id.*  "[A]mbiguity does not exist 'simply because the parties urge different interpretations.'"  *Hugo Boss*, 252 F.3d at 616 (quoting *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).  "If a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract."  *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012).  "If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured."  *Id.*  New York's application of *contra proferentem* "gains added force when ambiguities are found in an exclusionary clause."  *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 698 (2d Cir. 1998).

The relevant provision of the marine insurance policy in question "In the event of loss or damage, cost of repairs to be paid without deduction, new for old, except with respect to sails and covers of canvas or other like materials, the Assurers shall be liable for no more than the cost of repair or a reasonable value" affords cost of repair insurance coverage for the insured damaged vessel.  The last sentence can end after the word "repair."  The "reasonable value" term, as stated above, is nowhere defined in the policy, and is the only portion of the relevant policy language that is ambiguous.  A question could arise as to whether it refers to a reasonable value of the cost of repairs or a reasonable value of the insured vessel, but to the extent it means the latter, it cannot be employed to provide less insurance coverage than cost of repair coverage.  A commonsense approach that gives value and meaning to every word the parties chose to include in the policy is that "reasonable value" would be considered only if there is no identifiable cost of repair.  Here, that is not the case.  Empress Marine's damages consist entirely of ***actual amounts it has already paid out of its own pocket to repair the Vessel***.  The reasonable value term here is akin to surplusage in light of actual payments made.  Accordingly, it is hereby

**ORDERED AND ADJUDGED as follows:**

1. Plaintiff's Amended Motion for Summary Judgment and Memorandum of Law in Support of Summary Judgment (DE [75]) is **DENIED**.
2. Defendant's Motion for Summary Judgment (DE [76]) is **GRANTED**.
3. In accordance with Federal Rule of Civil Procedure 58, judgment for Defendant EMPRESS MARINE VENTURES, LTD. will be entered separately.

4. Defendant is **DIRECTED** to submit a proposed order to be e-mailed to singhal@flsd.uscourts.gov in Word format by **January 13, 2023**.

5. Defendant shall file its motion for attorneys' fees and/or costs by **January 23, 2023**, such motion must include affidavits of any sum certain due by Plaintiff, and any other supporting documentation necessary to determine Defendant's measure of damages.

6. The Clerk of Court is directed to **CLOSE** this case and **DENY AS MOOT** any pending motions.

7. Furthermore, all deadlines are **TERMINATED**, and all hearings are **CANCELLED**.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 11th day of January 2023.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished to counsel of record via CM/ECF